United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VYACHESLAV SHIROKOV, et al.,<br>Plaintiffs,<br>v.<br>DEVELUP PRIVATE ENTERPRISE, et al.,<br>Defendants. | Case No. 25-cv-02701-EMC<br><br>**SECOND ORDER RE DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 164 |

Previously, the Court granted in part and deferred in part Defendants' motion to dismiss. *See* Docket No. 205 (order). The Court dismissed all claims asserted against Mr. Ardatovskiy based on the doctrine of forum non conveniens. The Court ordered supplemental briefing on whether the claims against the remaining defendants (*i.e.*, Develup, Mr. Chernyatovich, Mr. Burlakov, Nexa Nova, and Infinius) should also be dismissed based on the same doctrine. Although the issue of forum non conveniens had been raised by the remaining defendants, *see* Mot. at 25, the Court found that supplemental briefing would be helpful to address specific issues.

Having considered the parties' supplemental briefs, as well as the prior filings made by the parties, the Court hereby **GRANTS** – but conditionally – the motion to dismiss the claims against the remaining defendants. The dismissal of Plaintiffs' claims against these defendants is conditioned on all Defendants' voluntary dismissal of their counterclaims (*i.e.*, not just the counterclaims of the remaining defendants but also the counterclaims of Mr. Ardatovskiy). The voluntary dismissal would be without prejudice to any defendant raising a counterclaim(s) in a foreign forum such as Cyprus.

/ / /

United States District Court
Northern District of California

# I. DISCUSSION

As indicated above, the main issue for the Court is whether Plaintiffs' claims against the remaining defendants (hereinafter the "non-Ardatovskiy defendants") should be dismissed based on forum non conveniens.

## A. Waiver of Forum Non Conveniens Argument

According to Plaintiffs, the Court need not reach the issue as a substantive matter because the non-Ardatovskiy defendants waived the right to assert forum non conveniens as a basis for dismissal. The Court previously rejected Plaintiffs' waiver argument when made with respect to Mr. Ardatovskiy. *See* Docket No. 205 (Order at 6-7 n.5). The Court reaches the same conclusion for the non-Ardatovskiy defendants: there was no waiver.[1]

In deciding the issue of waiver, the Court considers whether the non-Ardatovskiy defendants have taken action inconsistent with the assertion of forum non conveniens, or delayed in seeking dismissal based on forum non conveniens, and whether dismissal based on forum non conveniens would prejudice Plaintiffs. *Cf. Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016) (stating that "'[a] party seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts'"); *see also Baton v. Sas*, No. 21-cv-02470-EMC, 2025 U.S. Dist. LEXIS 21991, *18-19 (N.D. Cal. Feb. 6, 2025) (internal quotation marks omitted) (noting that, "[a]s a general matter, courts have found waiver of forum-selection clauses when the party invoking it has taken actions inconsistent with it, or delayed its enforcement, and enforcement would prejudice other parties[;] [t]he party waiving their right to enforce the clause must demonstrate clear, decisive, and unequivocal conduct manifesting such an intent," and "[t]his happens when a party substantially participated in the litigation to a point inconsistent with an intent").

The non-Ardatovskiy defendants have not taken action inconsistent with the assertion of forum non conveniens. Although the non-Ardatovskiy defendants have asserted counterclaims,

[1] Also, Plaintiffs did not assert in their opposition brief that the non-Ardatovskiy defendants had waived the argument of forum non conveniens. Thus, Plaintiffs waived their waiver argument.

that fact is not enough to show a clear, decisive, and unequivocal commitment to this forum because, as the Court noted with respect to Mr. Ardatovskiy, the counterclaims are arguably compulsory in nature. *See* Docket No. 205 (Order at 6-7 n.5). As for the fact that the non-Ardatovskiy defendants have engaged in discovery, that too is not dispositive, especially since discovery taken in this forum could still be used in a different forum. *See Southeast Power Grp. Inc. v. Vision 33, Inc.*, 855 Fed. Appx. 531, 537 (11th Cir. 2021) (noting that defendant took discovery two months before raising the issue of a forum selection clause; stating that "this fact alone would not be dispositive" on waiver). Finally, although the non-Ardatovskiy defendants did file a 12(b)(6) motion to dismiss (asking the Court to adjudicate the merits), the request for dismissal based on forum non conveniens was part of that same motion. *Compare id.* at 536 (noting that defendant moved to dismiss under Rule 12(b)(6) "[m]ore than four months before invoking the forum selection clause").

Plaintiffs assert that waiver can still be implied because the non-Ardatovskiy defendants delayed in raising forum non conveniens: Plaintiffs initiated this case in March 2025, but the non-Ardatovskiy defendants did not move to dismiss based on forum non conveniens until a year later. But Plaintiffs' charge of delay ignores the broader context of this litigation. First, part of the delay is attributable to the parties' jockeying over the pleadings, *see* Docket No. 107 (minutes), as well as the attempt to settle the case. *See* Docket No. 153 (Order at 1) (stating that "it makes sense for the settlement conference to take place first before the parties engage in motion practice"). Second, Plaintiffs' claim of delay glosses over the fact that, early in the proceedings, the non-Ardatovskiy defendants did move to dismiss based on lack of personal jurisdiction, and, there, they argued that the exercise of jurisdiction would not be reasonable, in part based on the inconvenience of this forum. *See* Docket No. 57 (Mot. at 12-14). Although the Court denied the motion to dismiss for lack of personal jurisdiction, that ruling was based in part on the fact that Plaintiffs were willing (at that time) to drop the individual defendants from the suit, which addressed some of the convenience issues. *See* Docket No. 85 (Order at 5). It was not unreasonable for the non-Ardatovskiy defendants to raise the issue of convenience again after they were brought back into the suit and new evidence came to light. *See* Docket No. 164 (Mot. at 25)

(noting that Mr. Chernyatovich "has been denied entry to the United States" and Mr. Burlakov "cannot obtain a U.S. consular interview before June 2027 – one month after trial – because the U.S. Embassy in Moscow has suspended visa operations").

To the extent Plaintiffs argue that they will be prejudiced, they have not made a sufficient showing. As noted above, discovery obtained in this case could still be used in a different forum, and Defendants have expressly stated they "agree to cooperate on re-use of discovery from this case." Docket No. 217 (Defs.' Supp. Br. at 1). And as discussed below, Plaintiffs have not made a sufficient showing that trial in a foreign forum such as Cyprus could not take place in a reasonable amount of time.

B. Forum Selection Clause

Because the non-Ardatovskiy defendants have not waived their argument of forum non conveniens, the next question is whether the forum non conveniens analysis must take into account a forum selection clause. In its prior order, the Court's analysis of forum non conveniens as to Mr. Ardatovskiy was informed by the fact that he had entered into contracts with Firebird[2] which contained forum selection clauses. *See* Docket No. 205 (Order at 8) (noting that, if there is a forum selection clause, then a plaintiff's choice of forum merits no weight, and a plaintiff cannot argue that private factors weigh against the forum identified in the clause).

According to the non-Ardatovskiy defendants, they are entitled to the benefit of the forum selection clause in one of the nondisclosure agreements ("NDAs") that Mr. Ardatovskiy had with Firebird. They focus on the second NDA which, as alleged by Plaintiffs, Firebird and Mr. Ardatovskiy entered into so that Mr. Ardatovskiy could "begin working on the improvement of the Rail.Ninja [web]site and development of the Rail.Ninja mobile app." TAC ¶ 41. In support of their position that they may rely on the forum selection clause in that NDA, the non-Ardatovskiy defendants cite, *inter alia*, *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509 (9th Cir. 1988).

/ / /

[2] Firebird of one of the two plaintiffs in this case. As alleged, Firebird is the exclusive licensee of intellectual property and trade secrets owned by Mr. Shirokov, which are used for Rail Ninja.

In *Manetti-Farrow*, the plaintiff had an exclusive dealership contract with Gucci Parfums. That contract had a forum selection clause designating Italy as the forum for resolution of disputes. After Gucci Parfums terminated the agreement and sued the plaintiff for breach of contract in Italy, the plaintiff filed its own suit in California. The plaintiff sued not only Gucci Parfums but also Gucci America and employees of both Gucci Parfums and Gucci America. Gucci America was not a party to the exclusive dealership contract, but had in a separate agreement consented to the terms of the contract.

The defendants invoked the forum selection clause in the exclusive dealership contract as a basis to dismiss the California suit against them. On appeal, the Ninth Circuit held that dismissal of the case was proper as to not only Gucci Parfums but also Gucci America. The court acknowledged that only Gucci Parfums had signed the contract containing the forum selection clause. "However, 'a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. We agree with the district court that the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants." *Id.* at 514 n.5.

In *Holland America Line v. Wartsila North America, Inc.*, 485 F.3d 450 (9th Cir. 2007), the Ninth Circuit reaffirmed this "closely related" test, holding that a forum selection clause in a contract to which the plaintiff and defendant Bureau Veritas were parties applied "equally to BVNA and BV Canada [nonsignatories to the contract] because any transactions between those entities and [plaintiff] took place as part of the larger contractual relationship between [plaintiff] and Bureau Veritas." *Id.* at 456.

Plaintiffs suggest that *Manetti-Farrow* and *Holland* have no application to the instant case because, in those cases, the defendant companies were affiliated entities, which is not the case here. But contrary to what Plaintiffs suggest, in the wake of these two Ninth Circuit cases, district courts have not held that a nonsignatory defendant is

> only "closely related" to a contractual relationship insofar as it is a corporate affiliate or director of [the] contracting [defendant], particularly in light of the Ninth Circuit's broad language that "*a range* of transaction participants, parties, and non-parties' can be bound to a forum selection clause." Instead, [the] cases demonstrate

> that a non-signatory party is bound by a forum selection clause when its alleged conduct is closely related to the *contract*.

*JH Portfolio Debt Equities, LLC v. Garnet Capital Advisors, LLC*, No. 2:17-cv-08839-DAS(JCx), 2018 U.S. Dist. LEXIS 226217, at *13 (C.D. Cal. Mar. 16, 2018) (emphasis in original)[3]; *see also W. Boxed Meats Distribs. v. Parker*, No. C17-5156 BHS, 2017 U.S. Dist. LEXIS 111755, at *14, 18-19 (W.D. Wash. July 18, 2017) (emphasizing that a court evaluates whether the nonsignatory defendant's conduct was closely related to the contract containing the forum selection clause – "not to its signatories or their conduct"). *Accord Adema Techs., Inc. v. Wacker Chemie AG*, No. 13-cv-05599-BLF, 2014 U.S. Dist. LEXIS 100242, at *19 (N.D. Cal. July 22, 2014) (in breach-of-contract case, where contract – a supply agreement – contained a forum selection clause, allowing a nonsignatory (Wacker USA) to claim the benefit of the clause because its "conduct is closely related to the contractual relationship between [the signatories] Wacker AG and Plaintiff: Wacker USA is alleged to have been the primary contact after polysilicon shipments commenced under the Supply Agreement[;] [m]oreover, Plaintiff's theory of Wacker USA's liability depends on the allegation that Wacker USA aided and abetted Wacker AG at all times in its allegedly unfair, illegal and tortious conduct with respect to depressing polysilicon spot market prices and enforcing the Supply Agreement against Plaintiff").

To be sure, there is language from some decisions suggesting that "closely related" is based on whether there is a close relationship between the nonsignatory defendant and the signatory defendant. For example, in *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714 (2d Cir. 2013), the Second Circuit stated that

> a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is "closely related" to another signatory. In such instances, the relationship between the non-signatory and that (latter) signatory must be sufficiently close that the non-signatory's enforcement of the forum selection clause is "foreseeable" to the signatory against whom the non-signatory wishes to enforce the

[3] In *JH Portfolio*, the court held that the "closely related" test was met because plaintiff's claims against the nonsignatory defendant were "premised on [its] alleged misrepresentations in the Offering Memorandum and sales negotiations, which [then] induced [plaintiff] to enter into the Sale Agreement" – containing the forum selection clause – with the signatory defendant. *JH Portfolio*, 2018 U.S. Dist. LEXIS 226217, at *14.



United States District Court
Northern District of California

> forum selection clause.

*Id.* at 723.[4]

But that language should not be considered in isolation. Immediately before making the statement above, the Second Circuit repeated the Ninth Circuit's closely related test. *See id.* at 722 (stating that "'where the alleged conduct of the nonparties is closely related *to the contractual relationship*, a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses'") (emphasis added). Moreover, the facts of *Magi* establish that the conduct of the nonsignatory defendant was, in fact, closely related to the contractual relationship between the plaintiff and the signatory defendant. In *Magi*, the plaintiff was a company that had obtained a license to commercially exploit artwork and artifacts in the Vatican Library collection. The plaintiff had obtained that license from another company called Second Renaissance, and Second Renaissance was able to give that license to the plaintiff because of a contract that it had with the Vatican Office of Publications. The contract between the plaintiff and Second Renaissance had a forum selection clause which designated Vatican City as the proper forum. In spite of that forum selection clause, the plaintiff filed suit against Second Renaissance, *plus* the Vatican State, in New York, complaining it had not been given access to the Vatican Library artwork and images. The Vatican State asserted that it had the right to enforce the forum selection clause, and the Second Circuit agreed because the conduct of the Vatican State was closely related to the contractual relationship between the plaintiff and Second Renaissance.

> [T]he Vatican State was known by [the plaintiff] Magi as the source of the contractual authority granted to Magi by the Sublicense Agreements. The Sublicense Agreements also specifically provided for the extensive and continuing involvement of the Vatican State in the execution of Magi's obligations and authority under the Sublicense Agreements. As a result of these considerations and the other factors described above, the Vatican State and Second Renaissance were "closely related" parties, and it was foreseeable that the Vatican State would enforce the forum selection clauses in the Sublicense Agreements against Magi. Magi's claims were thus properly dismissed by the district court.

[4] The Second Circuit added that this "'closely related' test does not apply to the question of whether a non-signatory is bound by a mandatory arbitration clause." *Magi*, 714 F.3d at 723. Arbitration involves taking a dispute outside of the court system entirely.

*Id.* at 723-24.

Accordingly, in deciding whether, here, the non-Ardatovskiy defendants can claim the benefit of the forum selection clause in the NDA between Firebird and Mr. Ardatovskiy, the Court must focus on whether the defendants' conduct is closely related to the contractual relationship between Firebird and Mr. Ardatovskiy. Firebird and Mr. Ardatovskiy entered into the NDA so that Mr. Ardatovskiy could "begin working on the improvement of the Rail.Ninja [web]site and development of the Rail.Ninja mobile app." TAC ¶ 41.

For purposes of this inquiry, the Court can divide the non-Ardatovskiy defendants into two groups.

- In the first group are Infinius and Nexa Nova. These are entities in which, as alleged, Mr. Ardatovskiy has a significant ownership interest. *See* TAC ¶¶ 5-6 (alleging that Infinius is owned and/or controlled, either in whole or in part, by Mr. Ardatovskiy); TAC ¶ 56(D) (alleging that Mr. Ardatovskiy owns 50% of Nexa Nova; the remaining owners are Mr. Chernyatovich (20%), Mr. Burlakov (20%), and two Swiss investors (5% each)). Both companies are affiliated with Rail Monsters. As alleged, Infinius offers the Rail Monsters app available on the Android platform, *see* TAC ¶¶ 5-6, and Nexa Nova owns or operates the website for Rail Monsters (railmonsters.com). *See* TAC ¶ 4.
- In the second group are Develup, Mr. Chernyatovich, and Mr. Burlakov. As alleged, Mr. Ardatovskiy brought these defendants to help work on the Rail Ninja project. Develup had its own contract with Mr. Shirokov. *See* TAC ¶ 49 & Ex. 4 (agreement). The contract provided that Develup would "develop the front-end software code for the Rail Ninja application and . . . provide related technical and maintenance support." TAC ¶ 50. Mr. Chernyatovich is the principal owner and alter ego of Develup. *See* TAC ¶¶ 10, 47. Mr. Burlakov is Mr. Chernyatovich's partner in a different software development company called Freeger, which also did work on the Rail Ninja project. *See* TAC ¶ 47.

/ / /

1. Infinius and Nexa Nova

The conduct of Infinius and Nexa Nova is closely related to the contractual relationship between Firebird and Mr. Ardatovskiy. As alleged, Infinius and Nexa Nova are the entities that Mr. Ardatovskiy created to use Rail Ninja's confidential and proprietary business information. Mr. Ardatovskiy had access to Rail Ninja's confidential and proprietary business information because of the NDA he signed with Firebird.

Plaintiffs argue that the closely related test cannot be satisfied because Infinius and Nexa Nova were not companies that existed at the time Mr. Ardatovskiy entered into the NDA with Firebird and began working on the Rail Ninja project. But Plaintiffs have not cited to any authority establishing that this is a requirement under the closely related test. Plaintiffs' argument is implicitly predicated on their position that "closely related" means that there is a close relationship between the nonsignatory defendant and the signatory defendant (at least at the time when the contract with the forum selection clause was entered) – something along the lines of parent and subsidiary, or corporation and officer. As discussed above, that is not correct. The key is a close connection transactionally to the contract, not necessarily personally between the signatory and nonsignatory defendants. Nonetheless, it is notable in this regard that there was in fact a close personal relationship here between these defendants and Mr. Ardatovskiy since Mr. Ardatovskiy created these defendant entities, albeit after the contract was entered into.

Furthermore, there is authority that is particularly on point with respect to the closely related test and its application to Infinius and Nexa Nova. In *Western Boxed Meats*, 2017 U.S. Dist. LEXIS 111755, the plaintiff was a company that had formerly employed several individual defendants. The individual defendants formed their own company, Double B, which competed with the plaintiff. The plaintiff sued both the individual defendants and Double B, claiming, *e.g.*, misappropriation of trade secrets and breach of contract. The individual defendants all had employment agreements with the plaintiff. But only two of the individual defendants (the Parkers) had an employment agreement that included a forum selection clause. All defendants tried to enforce the forum selection clause in the Parkers' employment agreement. While the court did not allow the non-Parker individual defendants to enforce the forum selection clause, it reached a

different conclusion for Double B. The court found that "Double B's alleged conduct is closely related to the Parkers' Employment Agreement" because "[t]he Parkers allegedly formed Double B with the purpose of competing with [plaintiff], in direct defiance of . . . the Employment Agreement," and plaintiff further "alleges that the Parkers, through Double B, are continuing to misuse [plaintiff's] confidential information and trade secrets, in direct defiance of . . . the Parkers' Employment Agreement. In this way, Double B is closely related to the Parkers' Employment Agreement because the Parkers are allegedly using the corporation to violate the terms therein." *Id.* at *15.

2. <u>Develup, Mr. Chernyatovich, and Mr. Burlakov</u>

Whether the conduct of Develup, Mr. Chernyatovich, and Mr. Burlakov is closely related to the NDA between Firebird and Mr. Ardatovskiy presents a closer question. The non-Ardatovskiy defendants argue that the closely related test is satisfied because Develup, Mr. Chernyatovich, and Mr. Burlakov were essentially acting as Mr. Ardatovskiy's agents in carrying out the Rail Ninja work. In this regard, they point out that Plaintiffs have alleged each defendant is an agent of the other. *See* TAC ¶ 11. The non-Ardatovskiy defendants also note the NDA includes a provision stating that Mr. Ardatovskiy as the "Receiving Party" has an obligation to keep Rail Ninja's information confidential and "shall ensure that [his] Representatives" do not improperly disclose or use the information.[5] *See* TAC, Ex. 2 (NDA ¶ 2.2).

This Court has previously recognized that the closely related test can be met where the nonsignatory defendant is acting as the agent of a signatory defendant with respect to the signatory defendant's contract with the plaintiff (containing the forum selection clause). *See Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 898-900 (N.D. Cal. 2024) (where plaintiffs sued both a company and its subcontractor for a data breach). But whether Develup, Mr. Chernyatovich, and Mr. Burlakov were acting as Mr. Ardatovskiy's agents with respect to the Rail Ninja work is not

[5] "Representatives" is defined as a party's "respective directors, officers, key managers, employees, agents and professional advisers, its Group (as defined below) and its beneficial owners." TAC, Ex. 2 (NDA ¶ 2.2). "'Group' means in relation to an undertaking, that undertaking and each and any subsidiary undertaking or parent undertaking[] from time to time of that undertaking, and each and any subsidiary undertaking from time to time of a parent undertaking of that undertaking." TAC, Ex. 2 (NDA ¶ 2.2).

United States District Court
Northern District of California

clear, at least not based on the record before the Court. As Plaintiffs point out, Develup had its own contract with Firebird, which might suggest that Develup (and therefore Mr. Chernyatovich) was not an agent of Mr. Ardatovskiy. On the other hand, that contract does not contain any provision on the protection of Rail Ninja confidential business and proprietary information, which could suggest that Firebird believed such a provision was unnecessary because Develup was a "Representative" of Mr. Ardatovskiy. This would be also be consistent with Plaintiffs' allegation that each defendant acted as an agent of the other.

For purposes of this order, the Court need not make a dispositive ruling. Even if the record is not clear on whether Develup, Mr. Chernyatovich, and Mr. Burlakov acted as agents of Mr. Ardatovskiy, the record is clear that these defendants allegedly conspired and colluded with Mr. Ardatovskiy to steal and use the Rail Ninja confidential business and proprietary information. All acted together on a matter that goes to the core of the NDA signed by Mr. Ardatovskiy. That is enough to meet the Ninth Circuit's closely related test – *i.e.*, the conduct of the nonsignatory defendants is closely related to the contractual relationship between Firebird and Mr. Ardatovskiy in which the latter promised to protect Rail Ninja confidential and proprietary business information.

The Seventh Circuit's decision in *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436 (7th Cir. 2012), is instructive. There, the plaintiffs were purchasers of time shares in villas at a resort located in Mexico. The seller of the time shares was a company named Desarrollos Turísticos Regina, S. de R.L. de C.V. ("DTR"). Each contract between a plaintiff and DTR included a forum selection clause. The plaintiffs sued two companies, Raintree and Starwood, alleging that the two were "in cahoots" and

> defrauded them by "pretend[ing] to have a Mexican subsidiary (DTR) take in money for [building the villas that the plaintiffs thought they were buying interests in] that would never be built." Raintree and Starwood are in the vacation resort business. Raintree operates a "vacation club" that consists of multiple timeshare resorts, while Starwood owns and operates a number of hotels and resorts including the Westin hotel chain.

*Id.* at 438.

/ / /

Although Raintree and Starwood were not parties to the sale contracts that contained the forum selection clause, they claimed the right to enforce the clauses. The Seventh Circuit acknowledged the closely related test, stating that it was "vague" but "can be decomposed into two reasonably precise principles, which we'll call 'affiliation' and 'mutuality' . . . ." *Id.* at 439. "A forum selection clause is sometimes enforced by or against a company that is under common ownership (for example as parent and subsidiary) with – that is, an affiliate of – a party to a contract containing the clause." *Id.* at 439-40 (citing, *inter alia*, *Holland America* and *Manetti-Farrow*). But mutuality is a theory independent of affiliation.

> The gist of the plaintiffs' complaint is that Raintree owed Starwood $10 million and that the two firms caused DTR to use the money it raised from the sales of the timeshares to pay off Raintree's debt instead of building the villas. The plaintiffs are thus alleging a conspiracy between Raintree and Starwood to defraud them, and *the question is whether an alleged conspirator can invoke the forum selection clause contained in a contract, signed by his alleged co-conspirator, that created or advanced the conspiracy*. The answer is yes – maybe not in every case, but in this one, where the suit accuses Raintree and Starwood of being secret principals of DTR, their agent in dealing with the timeshare buyers and thus in executing the fraud.
>
> A contract that the agent of secret principals makes with a third party can be enforced, at the third party's option of course . . . , against the secret principals. So the plaintiffs, because they alleged that Starwood (together with Raintree, by virtue of the conspiracy) controlled DTR, could have held Starwood to the forum selection clause had they wanted to sue in Mexico – and from this it follows that Starwood can hold the plaintiffs to the clause in the opposite situation and thus defend the suit in Mexico. Were it not for this principle of mutuality, the plaintiffs would have a choice of forums, and Starwood would not; and that could not have been the intention behind a clause that makes Mexico the exclusive forum irrespective of the parties' domiciles. "All [Starwood] is doing in invoking the forum selection clause to which it is not a party is accepting one of the premises of the plaintiff's suit – that [DTR is] indeed simply [a] cat's paw of [Starwood] – and pointing out that the implication is that the [timeshare] contracts, including the forum selection clause, are really between the plaintiffs and [Starwood]." Because Raintree is alleged to be a secret principal along with Starwood, it can enforce the forum selection clause on the same ground as Starwood, as well as on the affiliation ground that we discussed earlier.

*Id.* at 442-43 (emphasis added). The court emphasized that, "[f]rom a practical standpoint[,] it is evident that the case should be litigated as one case in one court in one country, and not as two cases in two courts in two countries." *Id.*

Like the Seventh Circuit, other courts have reached similar conclusions, holding that allegations of a conspiracy are a basis upon which a non-signatory defendant can invoke a forum selection clause in a contract between the plaintiff and the signatory defendant. *See, e.g.*, *Wilson v. 5 Choices, LLC*, 776 Fed. Appx. 320, 329 (6th Cir. 2019) (where plaintiffs had contracts with forum selection clauses with only some defendants but alleged that all defendants engaged in a RICO conspiracy, stating that "'the alleged conduct of the non-[privity Defendants] is so closely related to the contractual relationship[s] that the forum selection clause[s] appl[y] to all [D]efendants'[;] [t]his being the case, Plaintiffs should not be allowed to escape the enforceable forum-selection clauses they had with the privity Defendants merely by instead suing those Defendants' non-privity affiliates to recover on the very contracts containing the forum-selection clauses"); *Brian A. Carter, Inc. v. Smith*, No. 24-00271 SASP-KJM, 2025 U.S. Dist. LEXIS 272764, at *17-18 (D. Haw. Apr. 17, 2025) (where plaintiffs entered into a contract with a forum selection clause with only one defendant, holding that a nonaffiliated company could invoke the clause because of plaintiffs' allegations of conspiracy; plaintiffs' "allegations collectively suggest that [the nonsignatory defendant] was closely related to the [stock purchase agreement signed by the plaintiff and signatory defendant] through its strategic and operational involvement with [the signatory defendant]"). In these conspiracy-based cases, the issue of whether the plaintiff could foresee the nonsignatory defendant's invocation of the forum selection clause, *see Magi*, 714 F.3d at 723 (stating that "the relationship between the non-signatory and [the] signatory [defendants] must be sufficiently close that the non-signatory's enforcement of the forum selection clause is 'foreseeable' to the signatory [plaintiff] against whom the non-signatory wishes to enforce the forum selection clause"), is not material.

3. <u>Scope of Forum Selection Clause</u>

For the reasons discussed above, the Court holds that all of the non-Ardatovskiy defendants can invoke the forum selection clause, notwithstanding the fact that they are not signatories to the contract (between Firebird and Mr. Ardatovskiy) containing the forum selection clause. The only issue remaining is whether the claims asserted against the non-Ardatovskiy defendants fall within the scope of the clause – which, as the Court noted in its prior order, is

United States District Court
Northern District of California

broad. *See* Docket 205 (Order at 12) (evaluating whether the claims pled against Mr. Ardatovskiy had either a causal or logical connection to the NDA between Firebird and Mr. Ardatovskiy). The claims pled against the non-Ardatovskiy defendants are: trade secret misappropriation, copyright infringement, trademark infringement, unfair competition, breach of contract, and declaratory judgment of copyright ownership. The Court has already held that most of these claims as asserted against Mr. Ardatovskiy are logically connected to the NDA. *See* Docket No. 205 (Order at 12). The same reasoning applies to the claims pled against the non-Ardatovskiy defendants.

The only materially different claims are those for trademark infringement. Although Plaintiffs do not have to show the use of Rail Ninja *confidential* business and proprietary information to establish the trademark infringement claims, the trademark infringement claims still have a logical and transactional connection to the NDA protecting such information. Plaintiffs' trademark infringement claims are part of, as alleged, a continuing course of improper conduct by all Defendants: all Defendants allegedly stole the Rail Ninja trade secrets, used them to set up a competing service, and then deliberately used a name for the competing service (Rail Monsters) that was similar to Rail Ninja in order to confuse the consuming public. Rail Monsters, in effect, was a complete rip-off of Rail Ninja, both inside and out. The alleged ill intent of these collaborating defendants is a relevant factor in the trademark infringement analysis.[6]

C. Adequate Alternative Forum

Having concluded that the non-Ardatovskiy defendants may invoke the forum selection clause in the NDA, the Court now conducts its forum non conveniens analysis. As the Court noted in its prior order, this requires the Court to consider "(1) whether an adequate alternative forum exists, and (2) whether the balance of private and public interest factors favors dismissal."

---

[6] For trademark infringement under federal law, a plaintiff must show that it has a protectible ownership interest in the mark and that the defendant's use of the mark is likely to cause consumer confusion. *See Trader Joe's Co. v. Trader Joe's United*, 150 F.4th 1040, 1048 (9th Cir. 2025). With respect to likelihood of consumer confusion, one of the factors that is considered is the defendant's intent in selecting the mark. *See id.* at 1048-49 (listing the following factors: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines").

*Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001). "In a case in which there is no [applicable] forum-selection clause, 'a defendant bears the burden of demonstrating" both. *Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160, 1165 (9th Cir. 2020). While some deference is given to the forum selected by Plaintiffs, the fact that the Plaintiffs are foreign – *i.e.*, not at home in this forum – lessens the deference afforded to Plaintiffs' choice. *See Lueck*, 236 F.3d at 1143 (noting that, if a plaintiff chooses their own forum, it is reasonable to assume that the choice is convenient, but that assumption is much less reasonable when the plaintiff is foreign to the forum; thus, a foreign plaintiff's choice of forum is entitled to less deference).

The Court considers first whether there is an adequate alternative forum. "[A]n alternative forum ordinarily exists when the defendant is amenable to service of process in the foreign forum," and when the foreign forum "provide[s] the plaintiff with some remedy for his wrong." *Lueck*, 236 F.3d at 1143; *see also Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1225-26 (9th Cir. 2011) (same). Regarding the latter requirement, "it is only in 'rare circumstances . . . where the remedy provided by the alternative forum . . . is so clearly inadequate or unsatisfactory, that it is no remedy at all.'" *Lueck*, 236 F.3d at 1143; *see also Carijano*, 643 F.3d at 1225-26 (stating that the "some remedy" requirement is "'easy to pass'").

In the case at bar, the non-Ardatovskiy defendants affirmatively state that they consent to Cyprus as a forum. *See* Docket No. 217 (Defs.' Supp. Br. at 1). Cyprus is the same forum identified in the NDA between Firebird and Mr. Ardatovskiy. Thus, the only question is whether Cyprus provides Plaintiffs with some remedy for their wrong.

1. <u>Waiver</u>

In their original brief in opposition to the motion to dismiss (which covered both Mr. Ardatovskiy *and* the non-Ardatovskiy defendants), Plaintiffs *never* argued that Cyprus is not an adequate alternative forum. Accordingly, any such argument that Cyprus is not an adequate alternative forum – because, *e.g.*, it cannot provide some remedy – has effectively been waived.

2. <u>Selection of Cyprus in NDA Between Firebird and Mr. Ardatovskiy</u>

Even if there were no waiver, it is difficult to see how Plaintiffs can argue that Cyprus cannot provide some remedy given Firebird's decision to select Cyprus as a forum for a dispute

with Mr. Ardatovskiy (*i.e.*, in the NDA between the two). To be sure, this order focuses on the non-Ardatovskiy defendants, not Mr. Ardatovskiy himself. Nevertheless, that fact still weighs heavily against Plaintiffs. If Cyprus were not able to provide some remedy, then, presumably, the parties – including Plaintiffs – would not have been selected Cyprus as the forum in the forum selection clause at all. Furthermore, as a practical matter, it strains credulity to suggest that Cyprus – a member of the European Union – could not provide some remedy for the types of claims being asserted by Plaintiffs here. Certainly, Plaintiffs have not suggested or demonstrated that Cyprus courts are unique among courts in EU countries in not providing remedies for business claims.

3. Some Remedy

In their supplemental brief, Plaintiffs now suggest for the first time that Cyprus is not an adequate alternative forum for their intellectual property claims against Defendants – in particular, copyright infringement and trademark infringement. Plaintiffs argue that the U.S. market is the most important market for Rail Ninja, *see* Docket No. 216 (Pls.' Supp. Br. at 7); thus, they have an interest in bringing claims for violation of U.S. intellectual property law specifically. Plaintiffs seem to contend that, if they have to file suit in Cyprus, Cyprus only allows for intellectual property infringement claims (1) based on Cypriot or European law (2) where the infringement was territorial (not extraterritorial) in nature – *i.e.*, the infringement must have taken place in Cyprus or the European Union. Even if the Court were to entertain Plaintiffs' belatedly raised argument, after having waived it, the argument is not sufficiently persuasive to defeat forum non conveniens. For the reasons below, there may be remedies to address directly or indirectly U.S. based conduct by the non-Ardatovskiy defendants and damages in the U.S. market suffered by Plaintiffs.

a. Application of U.S. Law to Infringement of Intellectual Property Rights in the United States

As an initial matter, it is not clear that a Cyprus court could *not* entertain a claim by Plaintiffs that the non-Ardatovskiy defendants violated U.S. copyright and trademark law for infringement that took place in the United States. Presumably, a Cyprus court, like any EU court,

would undertake a choice-of-law analysis as to what law should apply to infringement that took place in the United States. *See, e.g.*, Regulation (EC) No. 593/2008 (Rome I) (law applicable to contractual obligations); Regulation (EC) No. 864/2007 (Rome II) (law applicable to noncontractual obligations). And application of U.S. law would certainly be a strong possibility if the facts so indicate. *See, e.g.*, Regulation (EC) 864/2007 (Rome II) (Ch. II, art. 4, § 1) ("Unless otherwise provided for in this Regulation, the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.").

That U.S. law could well apply is also supported by *Creative Technology, Ltd. v. Aztech System PTE*, 61 F.3d 696 (9th Cir. 1995). There, the Ninth Circuit took note that

> [t]he mere inability [of a Singapore court] to adjudicate acts of [copyright] infringement occurring in the United States under the Singapore Copyright Act *should not impede that court from applying United States copyright law to those claims* should the need arise. This Court has recognized the potential of American courts to entertain actions under the copyright laws of other nations. If our courts can entertain actions under the copyright laws of foreign nations, we see no reason why the High Court of Singapore is incapable of doing the same if need be.

*Id.* at 702-03 (emphasis added). The court thus recognized the possibility that a foreign court could apply U.S. laws to infringing conduct occurring in the U.S. The instant case, of course, involves a different foreign forum: Cyprus, not Singapore. Nevertheless, the point made by the Ninth Circuit in *Creative Technology* still obtains: while a Cyprus court may not be able to adjudicate infringement occurring in the United States under *Cyprus* law, it is very possible that the court could apply U.S. law to such infringement. Although other courts have not necessarily agreed with this reasoning of the Ninth Circuit,[7] this Court is not bound by those decisions.

---

[7] *See, e.g.*, *The Name LLC v. Ortiz*, No. 10 Civ. 3212 (RMB), 2010 U.S. Dist. LEXIS 121413, at *18 (S.D.N.Y. Nov. 16, 2010) ("The courts of this district have declined to dismiss cases pursuant to forum non conveniens where plaintiff asserts U.S. trademark or copyright claims. Ortiz has not shown that Plaintiff will be able to fully litigate its U.S. trademark rights in the Dominican Republic because [t]rademark rights are largely territorial, as they exist in each country solely according to that country's statutory scheme.") (internal quotation marks omitted).

In *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119 (4th Cir. 2022), the Fourth Circuit

b. Plaintiffs' Other Claims for Relief (*E.g.*, Trade Secret Misappropriation, Unfair Competition, or Breach of Contract)

Even if a Cyprus court could not entertain a claim under U.S. law for copyright or trademark infringement in the United States, Plaintiffs would still be able to pursue other claims pled in the operative complaint, *e.g.*, for trade secret misappropriation, unfair competition and breach of contract. *See Lockman Foundation v. Evangelical Alliance Mission*, 930 F.2d 764, 768-69 (9th Cir. 1991) (concluding that, even if the plaintiff could not bring a RICO or Lanham Act claim before a Japanese court, the plaintiff failed to "show[] that possible recovery on the *other* tort and contract claims would be 'so clearly inadequate or unsatisfactory that it is no remedy at all'") (emphasis added).[8] Notably, Plaintiffs have not argued that there is a territorial restriction for such claims (*e.g.*, that a Cyprus court could not consider such claims based on conduct in the United States). *See* Docket No. 216 (Pls.' Supp. Br. at 8) ("As strictly territorial claims rooted in United States law and interests, the *trademark and copyright* claims are not suitable for resolution in Cyprus.") (emphasis added).

/ / /

/ / /

---

concluded that, even if a court in the Netherlands could adjudicate rights under U.S. trademark law, the remedy would not be worth much. *See id.* at 136-37 ("The district court was correct to conclude that the Dutch court's inability to effectively adjudicate American trademark law claims disqualified it as an adequate forum. Dutch courts have at most a limited ability to adjudicate and enforce violations of American trademark law resulting in injuries to American trademark holders within the United States. The concept of territoriality is basic to trademark law, meaning that trademark rights exist in each country solely according to that country's statutory scheme. Under established trademark doctrine, therefore, Dutch courts could only offer empty remedies that American courts are not bound to recognize. [¶] dInc seeks to litigate trademark infringement claims that the Dutch court could not effectively adjudicate, for the Dutch ruling would carry little force in the United States.") (internal quotation marks omitted).

[8] *Accord Royal Gist-Brocades N.V. v. Sierra Prods., Ltd.*, No. 97-1147, 1999 U.S. Dist. LEXIS 12414, at *25 (E.D. Pa. Aug. 11, 1999) ("The inability to assert a particular statutory claim or the prospect of a lesser recovery does not render an alternative forum inadequate for purposes of a forum non conveniens dismissal."); *see also Pactiv Corp. v. Cube Plastics*, No. 07 C 5158, 2008 U.S. Dist. LEXIS 138703, at *10-11 (N.D. Ill. Jan. 30, 2008) ("We are persuaded by the reasoning in *Lockman* and *Creative Technology* and conclude that the Ontario court is an adequate forum even if it declined to adjudicate plaintiffs' U.S. intellectual property claims. In *Piper Aircraft*, the Supreme Court was concerned with the ability of the alternative forum to address the 'subject matter' of the lawsuit only insofar as it materially impacted the plaintiff's ability to obtain relief . . . .") (emphasis added).

c. Conduct in Cyprus or Europe

Finally, even if a Cyprus court could consider only conduct in Cyprus or Europe (for purposes of copyright or trademark infringement, or even trade secret misappropriation or unfair competition), there has been such conduct: Infinius, which allegedly used Rail Ninja information, is a Cypriot company, and some alleged misconduct took place in Europe because that is where Mr. Ardatovskiy, Develup, Mr. Chernyatovich, and Mr. Burlakov did their work on the Rail Ninja project and then developed Rail Monsters.

Plaintiffs suggest that pursuing misconduct in Cyprus or Europe would not be a sufficient remedy because their concern is the U.S. market. Nevertheless, that fact, even if accurate, would not mean that Cyprus cannot provide *some* remedy to Plaintiffs. As noted above, "it is only in 'rare circumstances . . . where the remedy provided by the alternative forum . . . is so clearly inadequate or unsatisfactory, that it is no remedy at all.'" *Lueck*, 236 F.3d at 1143; *see also* *Carijano*, 643 F.3d at 1225-26 (stating that the "some remedy" requirement is "'easy to pass'").

Defendants have asserted, without much dispute by Plaintiffs, that, should Cypriot or European law apply, there are significant intellectual property protections under such law. *See* Docket No. 217 (Defs.' Supp. Br. at 6-7) ("Cyprus is plainly adequate. It is a member state of the European Union whose law protects the trademark, copyright, and trade secrets at issue, including under Directives (EU) 2001/29/EC [copyright], (EU) 2015/2436 [trademark], (EU) 2016/943 [trade secrets], (EU) 2017/1001 [trademark], and (EU) 2019/790 [copyright]. Cyprus has implemented EU intellectual property laws including in Trade Marks Law, Cap. 268, Copyright and Related Rights Law, Law [5]9/1976, and Protection of Undisclosed Know-How and Business Information (Trade Secrets) Law, Law 164(I)/2020.").

Moreover, despite any territorial limit, Plaintiffs could potentially obtain remedies for violations of Cyprus or European law that would relate to the U.S. market. For example, in *Creative Technology*, the Ninth Circuit recognized that, even though the Singapore Copyright Act had territorial limitations, the

> lack of extraterritorial reach should not prevent the High Court of Singapore from subsuming the amount of damages incurred by [the defendant's] alleged illegal distribution of pirated sound cards

> *within the United States* in the amount of damages awarded under the Singapore Copyright Act for [the defendant's] alleged infringing acts *occurring in Singapore*.

*Creative Tech.*, 61 F.3d at 702 (emphasis added). The court took note that, in a Second Circuit case, a defendant had illegally reproduced a copyrighted poster in the United States – a predicate act of infringement – and then published it abroad in Israeli newspapers. The Second Circuit held that the lower court properly awarded the plaintiff damages for the extraterritorial acts of copyright infringement occurring in Israel, and "[w]e see no barrier preventing the High Court of Singapore from following a similar course of remedy if it so desires." *Id.*

Furthermore, the Ninth Circuit underscored that "the territorial limits of the Singapore Copyright Act cannot prevent the High Court of Singapore from granting [the plaintiff's] request to permanently enjoin [the defendant's] infringing conduct in Singapore" – which would "shut[] off the pipeline of infringing goods at the source." *Id.* Thus, the Singapore court was "capable of offering Creative an adequate monetary *or* injunctive remedy under the Singapore Copyright Act. While the scope of relief available in the High Court of Singapore may not be what Creative envisioned when it filed its claim in the United States district court, the forum non conveniens doctrine does not require it to be so." *Id.* (emphasis added).

Here, as in *Creative Technology*, it is possible that remedies for, *e.g.*, copyright or trademark infringement based on conduct in Cyprus or Europe could still yield damages related to the U.S. market and could have an impact on the U.S. market via injunctive relief.

d. Summary

Plaintiffs have waived any argument that the courts in Cyprus, to which they stipulated as a proper forum in the NDA between Firebird and Mr. Ardatovskiy, would not provide an adequate forum. In any event, even if there were no waiver, on the merits, this is not a case where remedies that could be given by a Cyprus court are so clearly inadequate as to defeat forum non conveniens. Plaintiffs may well have remedies in a Cypriot court for U.S.-based conduct and damages. At the very least, they likely have remedies for non-U.S. conduct which could well have a nexus to U.S. markets. Even if the remedy in the Cypriot courts were not as expansive as that in this Court, for purposes of forum non conveniens, a lesser remedy is not the same thing as no remedy at all. *See*

*Lueck*, 236 F.3d at 1143 (stating that, "[i]n *Piper Aircraft* [which addressed a crash of an airplane in Scotland], the Supreme Court held that a foreign country was not an inadequate forum merely because its laws offered the plaintiff a lesser remedy than he could expect to receive in the United States court system"). Defendants have established that Plaintiffs will have "some remedy" in the Cypriot courts, as it likely would have in other EU courts. *See Carijano*, 643 F.3d at 1225-26. Cyprus is an adequate forum.

D. Private and Public Interest Factors

Because Cyprus is an adequate alternative forum, the Court now turns to the private and public interest factors for the doctrine of forum non conveniens.

> Factors relating to the parties' private interests include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Public-interest factors may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law."

*Atl. Mar. Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 62 n.6 (2013).

1. Private Factors

Because, as discussed above, the non-Ardatovskiy defendants may rely on the forum selection clause in the NDA, the Court

> should not consider arguments about the parties' private interests. When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum.

*Id.* at 64.

But even assuming the Court should still consider the private factors – *i.e.*, because the forum selection clause cannot be invoked by the non-Ardatovskiy defendants – those factors weigh in favor of dismissal. Even if this case were simply about the U.S. market, all of the sources of proof are in Europe, not the United States, because none of the parties in the case are

United States District Court
Northern District of California

located in the United States. This is true for both Plaintiffs and Defendants.

- With respect to Plaintiffs, Mr. Shirokov is a citizen of Malta and resides in Monaco. *See* TAC ¶ 1. Firebird is incorporated in Hong Kong and has a principal place of business in Monaco. *See* TAC ¶ 2.
- As for Defendants, Develup is located in Ukraine, *see* TAC ¶ 3; Nexa Nova is a U.K. limited company with a principal place of business in France, *see* TAC ¶ 4; Infinius is a Cyprus limited company with a principal place of business in France, *see* TAC ¶ 5; Mr. Ardatovskiy is a citizen of Russia and resides in France, *see* TAC ¶ 7; Mr. Burlakov is a citizen of Russia and resides in Russia, *see* TAC ¶ 8; and Mr. Chernyatovich is a citizen of Moldova and resides in Moldova. *See* TAC ¶ 9.

Given the locations of the parties, evidence will be more easily obtained from Cyprus rather than the United States. *See also* TAC ¶ 44 (alleging that Mr. Ardatovskiy worked on the Rail Ninja project from Mr. Shirokov's home in Monaco). While Plaintiffs fairly point out that technological advances allow for documentary evidence to be fairly accessible no matter what the location, this case will not simply turn on documentary evidence but rather will involve testimonial evidence. And even if workarounds could be found for depositions, Defendants still have an interest in providing testimonial evidence in person at trial. As indicated above, that would pose a problem if the case were tried in the United States given that Mr. Chernyatovich "has been denied entry to the United States" and Mr. Burlakov "cannot obtain a U.S. consular interview before June 2027 – one month after trial – because the U.S. Embassy in Moscow has suspended visa operations."[9] Docket No. 164 (Mot. at 25).

---

[9] In their supplemental briefs, both parties address Cyprus's relationship with Russia – largely because of Mr. Burlakov who lives in Russia and is affiliated with a Russian company (Freeger) that also worked on the Rail Ninja project. The non-Ardatovskiy defendants argue that the relations between Cyprus and Russia are stronger compared to the relations between the United States and Russia. Plaintiffs do not dispute that "Russia and Cyprus are linked by both Hague Conventions and a bilateral legal-assistance treaty," Docket No. 217 (Defs.' Supp. Br. at 8), and that there is no judicial cooperation between Russia and the United States. *See* https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html (last visited 8/18/2026). Plaintiffs maintain, however, that "Cypriot-Russian cooperation has not survived Russia's invasion of Ukraine: Cyprus joined EU sanctions on Russia, which has designated Cyprus a hostile country." Docket No. 216 (Pls.' Supp. Br. at 9; *see also* Ktoridis Decl. ¶ 6 ("Following the Russian invasion of Ukraine, judicial

2. Public Interest Factors

Turning to the public interest factors, these "will rarely defeat" a motion to dismiss. *Atl. Mar.*, 571 U.S. at 64. Here, Plaintiffs' selection of Cyprus as a forum in the NDA between Firebird and Mr. Ardatovskiy weighs heavily against them because it can reasonably be inferred that the administrative difficulties flowing from court congestion cannot be great or the forum would not have been selected in the first instance.

The Court has reviewed the declaration from Cyprus counsel, Mr. Ktoridis, which was submitted by Plaintiffs. But this declaration is hard to credit because very little information is disclosed about Mr. Ktoridis's background other than he works for a certain firm, leads its Dispute Resolution and Litigation Division, and has "extensive commercial litigation and arbitration experience." Ktoridis Decl. ¶ 1. Mr. Ktoridis does not address in his declaration, *e.g.*, his years of experience, the size of his firm, how much litigation he or the firm does, what kind of commercial litigation he or the firm does, how often his or the firm's cases are resolved without going to trial, how many trials he or the firm has done, the time for those cases to get to trial, and so forth. Furthermore, for the most part, Mr. Ktoridis does not provide information about the Cyprus courts and Cyprus litigation more broadly.

In his declaration, Mr. Ktoridis does state that, "this past judicial year[,] I have tried a case filed in 2016 and another in 2018," and, apparently based on this experience, he states that "the expected time from filing a civil action to a final decision on the merits in the first instance, such as a verdict following trial, is normally seven years." Ktoridis Decl. ¶¶ 2-3. But the experience of

---

cooperation between Cyprus and the Russian Federation has been significantly impaired in practice. As a European Union Member, Cyprus is participating in European Union-wide sanctions against Russia, and the Russian Federation has included Cyprus on its list of unfriendly states. There is a treaty of judicial cooperation between the Russian Federation (as the successor state of the former USSR) and Cyprus, but it currently has limited practical effect. I view it as extremely unlikely, based on my experience, that a Russian court would enforce Cypriot orders seeking discovery or compelling the testimony of witnesses from Russia.").

For purposes of this order, the Court assumes in Plaintiffs' favor that relations between Cyprus and Russia are not materially better than those between Cyprus and the United States, even though the Ktoridis Declaration is somewhat vague in nature. But even with this assumption, the private factors still weigh in favor of the non-Ardatovskiy defendants because none of the parties – or witnesses – are based in the United States. As stated above, all sources of proof are in Europe.

a single person within a single firm is hardly dispositive, particularly when no information is even provided about the two cases specified. *Compare Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034, 1043 (9th Cir. 2022) ("[I]n 2018, the International Intellectual Property Alliance found, with regard to copyright enforcement, that '[Vietnamese] civil and criminal courts are not a realistic avenue for copyright owners . . . . To date, there have been relatively few civil court actions involving copyright infringement in Vietnam. The main reasons for this are complicated procedures, delays, and a lack of certainty as to the expected outcome. Building IP expertise must be a part of the overall judicial reform effort'").

Moreover, Mr. Ktoridis acknowledges that, in 2023, "[i]n an effort to reduce litigation delays, the [Cyprus] judiciary introduced new Civil Procedure Rules in 2023, governing all proceedings initiated thereafter." Ktoridis Decl. ¶ 4. This case, if filed in Cyprus, would be governed by these rules (indeed, would have been governed by these rules if filed at the time the original complaint was filed in this District). According to Mr. Ktoridis, "to the best of my knowledge, no non-summary case filed since 2023 has reached final determination on the merits[;] therefore for post-2023 cases the anticipated case duration remain[s] purely speculative." Ktoridis Decl. ¶ 4. But again, the experience of a single person within a single firm cannot dictate resolution of the forum non conveniens issue where the credibility of that person is limited, especially given the selection of Cyprus as the appropriate forum in the NDA between Firebird and Mr. Ardatovskiy.

Plaintiffs maintain that the public interest factors weigh in their favor because the United States has an interest in having U.S. claims adjudicated in the United States and U.S. courts are more familiar with U.S. law. While these are fair points to raise, they are not dispositive or forum non conveniens would be foreclosed any time a plaintiff brought a claim based on federal law. *See Atl. Mar.*, 571 U.S. at 64 (stating that the public interest factors "will rarely defeat" a motion to dismiss based on forum non conveniens); *cf. In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (in discussing the same basic private and public interest factors for purposes of transfer under 28 U.S.C. § 1404(a), stating that none of the factors "'can be said to be of dispositive weight'").

## II. CONCLUSION

Accordingly, the Court dismisses the remaining claims against the non-Ardatovskiy defendants based on forum non conveniens. Plaintiffs have waived the argument that Cyprus is not an adequate alternative forum because they never made that contention in their original opposition brief. Moreover, Plaintiffs could hardly argue such given their selection of Cyprus as the forum for the NDA between Firebird and Mr. Ardatovskiy. In any event, there is no indication that a Cyprus court could not entertain a U.S. copyright or trademark claim based on alleged infringement in the United States. And even if it could not, Plaintiffs could still get remedies for their other claims (*e.g.*, trade secret misappropriation, unfair competition, and breach of contract). Furthermore, even if a Cyprus court could entertain only a claim based on, *e.g.*, copyright or trademark infringement in Cyprus and/or the European Union, some damages implicating the U.S. market might still be obtained, and broad injunctive relief could also provide some remedy affecting the U.S. market. Plaintiffs have pointed to nothing uniquely limiting or disabling about the Cyprus courts which differentiates them from other European Union judicial fora.

With respect to the private factors, because of the forum selection clause, they need not be addressed. But even if the Court were to consider them, the private factors weigh in favor of the non-Ardatovskiy defendants because all sources of proof are in Europe, as are all of the parties and witnesses. With respect to the public interest factors, it can reasonably be inferred that the administrative difficulties flowing from court congestion in Cyprus cannot be great or Firebird would not have selected the forum in conjunction with its NDA with Mr. Ardatovskiy. The Ktoridis Declaration submitted by Plaintiffs is given little weight.

The dismissal of the claims, however, is conditioned on all Defendants (both Mr. Ardatovskiy and the non-Ardatovskiy defendants) dismissing without prejudice their counterclaims against Plaintiffs. If the counterclaims were to remain in this Court, the Court

/ / /

/ / /

/ / /

/ / /

would need to reassess its forum non conveniens analysis. All Defendants shall have one week from the date of this order to file a statement as to whether they shall voluntarily dismiss their counterclaims. Such a dismissal would be without prejudice to Defendants raising the counterclaims in a foreign forum such as Cyprus.

This order disposes of Docket No. 164.

**IT IS SO ORDERED**.

Dated: August 19, 2026

EDWARD M. CHEN
United States District Judge